**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Ave., Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LUKE JOHNSON, derivatively on behalf of AMERICAN RENAL ASSOCIATES HOLDINGS, INC., <br><br>      Plaintiff, <br><br>      vs. <br><br> JOSEPH A. CARLUCCI, JASON M. BOUCHER, JONATHAN L. WILCOX, MICHAEL E. BOXER, SUSANNE V. CLARK, THOMAS W. ERICKSON, ROBERT H. FISH, JARED S. HENDRICKS, JOHN M. JURELLER, SYED T. KAMAL, PATRICK T. RYAN, and STEVEN M. SILVER, <br><br>      Defendants, <br><br>      and <br><br> AMERICAN RENAL ASSOCIATES HOLDINGS, INC., <br><br>      Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT; AND** <br> **(4) WASTE OF CORPORATE ASSETS** <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Luke Johnson ("Plaintiff"), by his undersigned attorneys, derivatively and on

behalf of Nominal Defendant American Renal Associates Holdings, Inc. ("American Renal" or

the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Joseph A. Carlucci, Jason M. Boucher, Jonathan L. Wilcox, Michael E. Boxer, Susanne V. Clark, Thomas W. Erickson, Robert H. Fish, Jared S. Hendricks, John M. Jureller, Syed T. Kamal, Patrick T. Ryan, and Steven M. Silver (collectively, the "Individual Defendants" and together with American Renal, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of American Renal, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding American Renal, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by American Renal's directors and officers from August 10, 2016 through the present (the "Relevant Period"). American Renal offers outpatient dialysis services in clinics across 26 states and the District of Columbia.[1] Dialysis is the process of artificially filtering a patient's blood. This life-sustaining process is used to treat various chronic kidney diseases.

---

[1] As of September 30, 2018. http://ir.americanrenal.com/company-profile. Last visited July 19, 2019.

2.      The Company prides itself on its business model, which is a 'joint venture' model between itself and local nephrologists (kidney specialists). Through this model, American Renal holds a controlling interest in each clinic, while local nephrologists hold substantial noncontrolling interests. The Company, which advertises itself as "the largest dialysis services provider in the United States" with a joint venture model, believes that this promotes a stable clinical infrastructure while allowing for local nephrologist independence.

3.      Centerbridge Partners, L.P. ("Centerbridge"), a private investment firm, has been American Renal's controlling shareholder since Centerbridge acquired the Company in 2010. As of March 8, 2018, Centerbridge holds 54.9% of American Renal's common stock.

4.      From at least the end of 2016 throughout 2018, the Company suffered from a material weakness relating to its accounting procedures that would subject it to an SEC investigation and result in the need to restate numerous SEC filings deemed incorrect and unreliable. Specifically, the Company was engaged in improper accounting practices related to, *inter alia*, the manner in which the Company was recording anticipated revenue from third parties. These practices resulted in material errors in the Company's financial statements filed throughout the Relevant Period. However, during this time, the Company maintained that its internal control over financial reporting was effective and that its disclosures were complete.

5.      After the market closed on August 9, 2016, the Company filed its quarterly report with the SEC for the period ended June 30, 2016 on a Form 10-Q (the "2Q16"). The 2Q16 reported that American Renal's internal controls over its financial reporting remained effective and unchanged. This assurance was repeated in the Company's next quarterly report filed with the SEC on a Form 10-Q on November 10, 2016, for the quarterly period ended September 30, 2016.

6.      On March 8, 2017, the Company filed its annual report with the SEC for the 2016 fiscal year[2] on a Form 10-K (the "2016 10-K"), maintaining that American Renal's internal controls were uncompromised. These assurances were repeated in the Company's three following quarterly reports for the periods ended March 31, June 30, and September 30, 2017, which were filed on May 9, August 8, and November 14, 2017, respectively.

7.      On May 1, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement"), again representing that the Company's internal controls were effective.

8.      On March 6, 2018, the Company filed its annual report with the SEC for the 2017 fiscal year on a Form 10-K (the "2017 10-K").

9.      On March 16, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"), which again made no mention of any material weakness in American Renal's internal controls.

10.     On May 8, 2018 the Company filed its quarterly report with the SEC for the period ended March 31, 2018 (the "1Q18"), stating that there had been no change in its internal controls. The 1Q18 disclosed that American Renal had adopted a new standard of revenue recognition, which slightly modified its accounting procedures for uncollectible accounts, as of January 1, 2018. These statements were repeated verbatim in the following quarterly report filed with the SEC on a Form 10-Q for the quarterly period ended June 30, 2018, filed on August 7, 2018.

11.     On November 9, 2018, the Company filed its quarterly report with the SEC for the period ended September 30, 2018 on a Form 10-Q (the "3Q18"). Therein, in addition to repeating its prior assurances that its internal controls remained intact, American Renal disclosed that the

---

[2] American Renal's fiscal year follows the regular calendar year. Unless stated otherwise, all references to a "fiscal year" denote a period ended December 31 of that calendar year.

SEC had requested "documents and information relating to certain revenue recognition, collections, and related matters" from the Company.

12.     On this news, the price per share of American Renal dropped by $0.74 per share (over 4%), from a close of $17.50 on November 9, 2018 to close at $16.76 on November 12, 2018.

13.     On March 8, 2019, the Company filed a current report on a Form 8-K and a Notification of Late Filing on a Form 12b-25 with the SEC, revealing that American Renal would not be able to timely file its annual report on Form 10-K for the fiscal year 2018. Both Forms disclosed that the delay was due to American Renal's internal Audit Committee investigation, which had been triggered by the SEC's inquiry into the Company's accounting methods. Both disclosures went on to report that the Company was reviewing its accounting practices for its financial statements filed for the fiscal years 2014 through 2017, as well as the first three quarters of 2018.

14.     On this news, American Renal's share price dropped $2.05 (over 16%) from a close of $12.51 on March 7, 2019 to close at $10.46 on March 8, 2019.

15.     On March 27, 2019, the Company filed a current report on a Form 8-K with the SEC (the "March 27, 2019 8-K") announcing both the resignation of its CFO and impending plans to restate its prior financial results for the fiscal years 2014 to 2017 and the first three quarters of 2018 as reported in the Company's 2016 and 2017 10-Ks, and its quarterly reports filed on Form 10-Qs  for the periods ended March 31, June 30 and September 30, 2016; March 31, June 30 and September 30, 2017; and March 31, June 30 and September 30, 2018, which were unreliable.

16.     On this news, American Renal's share price plummeted by $3.69 (over 38%) from a close of $9.70 on March 27, 2019 to close at $6.01 on March 28, 2019.

17.     As of the time of filing this Complaint, there has been no restatement of any prior financial period, and the Company has yet to publish its annual report for the fiscal year 2018 or its quarterly report for the quarter ended March 31, 2019, which was due in May. For both of these periods, American Renal released unaudited balance sheets on two Form 8-Ks published on April 25, 2019 and May 15, 2019, respectively.

18.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to American Renal, willfully or recklessly made and/or caused the Company to make false and misleading statements concerning the effectiveness of the Company's internal controls and compliance with relevant financial reporting principles. The false and misleading statements and omissions of material fact failed to disclose that: (1) The Company's internal control over financial reporting contained material weaknesses, (2) American Renal was not, *inter alia*, preparing its financial statements in accordance with generally acceptable accounting principles ("GAAP"), as such, the Company became the subject of heightened regulatory scrutiny and an SEC investigation pertaining to its revenue recognition practices, collections, and matters connected thereto, (3) the Company's financial statements reported in annual and quarterly reports filed with the SEC from 2016 through 2018 at least were incorrect and unreliable, and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

19.     During the Relevant Period, when the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make the false and misleading statements discussed herein, the investing public was under a false impression of the Company's business, operations, and financial success.

20.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

21.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

22.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), and two of its former Chief Financial Officers ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, costing the Company millions of dollars.

23.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Action, of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of American Renal. Plaintiff has continuously held American Renal common stock since before the beginning of the Relevant Period.

### Nominal Defendant American Renal

30.     American Renal is a Delaware corporation with its principal executive offices at 500 Cummings Center, Suite 6550, Beverly, Massachusetts, 01915. American Renal's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ARA."

**Defendant Carlucci**

31.     Defendant Joseph A. Carlucci ("Carlucci") co-founded the Company and has served as the Company's CEO since 1999. Defendant Carlucci has also served as Chairman of the Company's Board since 2012. According to the Company's 2018 Proxy Statement, as of March 8, 2018, Defendant Carlucci beneficially owned 1,369,067 shares of the Company's common stock, which represented 4.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Carlucci owned over $30.6 million worth of American Renal stock.

32.     For the 2017 fiscal year, Defendant Carlucci received $3,352,624 in compensation from the Company. This included $892,203 in salary, $1,100,004 in stock awards, $614,019 in option awards, $624,542 in non-equity incentive compensation, and $121,856 in all other compensation.

33.     The Company's 2018 Proxy Statement stated the following about Defendant Carlucci:

> **Joseph A. Carlucci**[3] is a co-founder of our Company and our Chief Executive Officer and has served as the Chairman of our Board of Directors since 2012. Mr. Carlucci has more than 39 years of experience in the dialysis services industry. Mr. Carlucci also served as our Chief Operating Officer and Treasurer from our inception in 1999 to 2005. Prior to founding our company, Mr. Carlucci served as President and CEO of Optimal Renal Care, a joint venture between FMCNA and Kaiser Permanente of Southern California designed as a disease management organization providing additional opportunities to improve treatment outcomes, improve cost structures, and implement new technologies and methods of dialysis care. Prior to that, Mr. Carlucci served as Vice President of Administration at FMCNA and was responsible nationally for managed care, medical director relations and facility development. He has operations experience from Facility Administrator to Director of U.S. Operations at FMCNA. Mr. Carlucci also serves on the board of directors of Colorado Center for Reproductive Medicine. Mr. Carlucci holds a B.S. degree in Accounting from Bentley University.

---

[3] Emphasis in original unless otherwise noted in this Complaint.

Mr. Carlucci, as one of our co-founders, brings to the Board his experience as an executive in the dialysis services industry, in addition to providing a management perspective to Board deliberations and valuable information about the status of our day-to-day operations given his role as our Chief Executive Officer.

**Defendant Boucher**

34.     Defendant Jason M. Boucher ("Boucher") served as the Company's Vice President and CFO from October 1, 2018 until his abrupt resignation on March 26, 2019. Previously, Defendant Boucher served as the Company's Chief Accounting Officer from January 2017 to September 2018 and as its Vice President of Finance from 2011 to 2016. Under the terms of his employment agreement, Defendant Boucher was eligible to receive a base salary of $400,000, and an annual cash bonus of up to $300,000 in connection with his employment as CFO and Vice President.[4]

35.     The Company's 2018 Proxy Statement stated the following about Defendant Boucher:

> ***Jason M. Boucher*** is our Vice President of Finance, Chief Accounting Officer and Treasurer.  Mr. Boucher was appointed our Chief Accounting Officer and Treasurer in January 2017 and has served as our Vice President of Finance since May 2011.  Mr. Boucher is a certified public accountant with more than 20 years of accounting and finance experience spanning a number of roles, including Corporate Controller, Assistant Controller and Financial Reporting Manager. Prior to joining our Company, Mr. Boucher was the Corporate Controller of Pegasystems Inc., a leader in business process software solutions from 2011 to 2015.  Mr. Boucher additionally held financial positions in various technology companies. Mr. Boucher received his B.S. degree in Accounting from Plymouth State College in 1994 and his M.B.A. from Suffolk University's Sawyer School of Management in 1996.

**Defendant Wilcox**

36.     Defendant Jonathan L. Wilcox ("Wilcox") served as the Company's Vice President and CFO from 2011 to September 30, 2018.

---

[4] *See* Company's Form 10-Q filed with the SEC on August 7, 2018.

37.     For the 2017 fiscal year, Defendant Wilcox received $1,611,448 in compensation from the Company, comprised of $425,000 in salary, $318,750 in bonus compensation, $600,002 in stock awards, $246,885 in option awards, and $20,811 in all other compensation.

38.     According to the Company's 2018 Proxy Statement, as of March 8, 2018, Defendant Wilcox beneficially owned 143,304 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Wilcox owned approximately $3.2 million worth of American Renal stock.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Wilcox:

> **Jonathan L. Wilcox** is our Vice President and Chief Financial Officer. Prior to being appointed our Chief Financial Officer in 2011, Mr. Wilcox served as the Vice President of Finance from 2009 to 2011. Mr. Wilcox is a certified public accountant with more than 20 years of experience in accounting and finance. From 2008 to 2009, Mr. Wilcox was Vice President of Finance at Vlingo, Inc., a speech recognition software company, where he was responsible for all aspects of finance and administration, and, from 2005 to 2008, Mr. Wilcox was Executive Director of Finance at Cynosure, Inc., a medical device manufacturer, where he was primarily responsible for all worldwide financial activities. Mr. Wilcox has additionally served as Director of Finance at Forrester Research Inc., a public research company, and as an audit manager at Arthur Andersen LLP in its Boston office. Mr. Wilcox received his B.S. degree in Government and History from Centre College in 1995 and his Master of Professional Accounting and M.B.A from Northeastern University in 1996.

**Defendant Boxer**

40.     Defendant Michael E. Boxer ("Boxer") has served as a Company director since 2010. He also serves as the Chair of the Compliance Committee.

41.     According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Boxer beneficially owned 72,467 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Boxer owned approximately $1.6 million worth of American Renal stock.

42. From 2011 to 2018, Defendant Boxer acted as a senior advisor to Centerbridge, American Renal's controlling shareholder.

43. For the 2017 fiscal year, Defendant Boxer received $322,999 in compensation from the Company. This included $83,000 in cash fees and $239,999 in stock awards.

44. The Company's 2018 Proxy Statement stated the following about Defendant Boxer:

**Michael E. Boxer** has served as a member of our Board of Directors since 2010. Mr. Boxer is a senior advisor (i.e., an independent consultant) to Centerbridge Partners, L.P. Mr. Boxer is also the vice chairman of the board of directors and chairman of the audit committee of Remedi SeniorCare Holding Corporation and serves on the board of directors and is chairman of the audit committee of Superior Vision Corporation. Mr. Boxer also serves on the board of directors of GI Scientific. He served as chairman of the audit committee and a board member of Genesis Healthcare, Inc. (formerly Skilled Healthcare Group, Inc.) from 2006 until 2015. Additionally, Mr. Boxer is President of The Enterprise Group Ltd., a healthcare advisory firm. Mr. Boxer served as the chief financial officer of HealthMarkets, Inc., a provider of health and life insurance products, from 2006 to 2008. Mr. Boxer was chief financial officer of Mariner Health Care, Inc., a 300-facility skilled nursing facility and 15-hospital long-term acute care provider, from 2003 to 2005. From 1998 to 2002, Mr. Boxer served as chief financial officer of Allergan plc (formerly Watson Pharmaceuticals Inc.), an integrated specialty pharmaceutical company. Prior to that, Mr. Boxer was a healthcare investment banker at Furman Selz. Mr. Boxer received a B.B.A. in Finance from Colorado State University and an M.B.A. from the University of Chicago Booth School of Business.

Mr. Boxer brings to the Board his experience in executive management and accounting, including his significant experience as a senior executive as well as a board member and chairman of audit committees at various healthcare companies.

**<u>Defendant Clark</u>**

45. Defendant Susanne V. Clark ("Clark") has served as a Company director since April 2017.

46. Defendant Clark is employed by Centerbridge, the Company's controlling shareholder, as General Counsel and as a Senior Managing Director. Because of Defendant Clark's employment with Centerbridge, the Company does not provide her with additional compensation in connection with her service on the Board.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Clark:

**Susanne V. Clark** has served as a member of our Board of Directors since April 2017. Ms. Clark has served as a Senior Managing Director and the General Counsel of Centerbridge Partners, L.P. since December 2009. Prior to joining Centerbridge Partners, L.P., Ms. Clark was the General Counsel and Chief Compliance Officer of Basso Capital Management, L.P ("Basso"), an SEC-registered investment adviser managing multi-strategy, convertibles and credit funds from January 2007 to November 2009. Prior to Basso, Ms. Clark was the Deputy General Counsel of Amaranth Group Inc., an investment adviser for multi-strategy and long/short equity funds from October 2003 to December 2006. Before that, from May 1999 to October 2003, Ms. Clark served as Vice President and Assistant General Counsel at Goldman Sachs, where she was responsible for finance and corporate legal matters involving The Goldman Sachs Group, Inc. and, prior to that, for legal matters involving the investment banking business of Goldman, Sachs & Co. Ms. Clark started her career as an Associate in the New York office of Shearman & Sterling LLP. Ms. Clark graduated with honors from Swarthmore College and received her J.D. from Columbia Law School.

In nominating Ms. Clark for election as a director, the Board considered her significant experience in working with companies controlled by private equity sponsors and her executive experience with a wide range of issues, including finance and corporate legal matters.

### Defendant Erickson

48.     Defendant Thomas W. Erickson ("Erickson") has served as a Company director since 2011, and he is the Chair of the Compensation Committee. Defendant Erickson is also a member of the Compliance Committee and the Nominating and Corporate Governance Committee.

49.     According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Erickson beneficially owned 39,754 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Erickson owned approximately $888,899 worth of American Renal stock.

50.     For the 2017 fiscal year, Defendant Erickson received $329,999 in compensation from the Company. This included $90,000 in cash fees and $239,999 in stock awards.

51.     The Company's 2018 Proxy Statement stated the following about Defendant Erickson:

> **Thomas W. Erickson** has served as a member of our Board of Directors since 2011. Mr. Erickson also serves as chairman of the executive committee of Luminex Corporation, a developer and manufacturer of biological testing technologies and products for the diagnostics, pharmaceutical and life sciences industries, and is chairman of the executive committee of 3D Systems Corporation, a developer and manufacturer of 3D printing products and services. Mr. Erickson has also held various public company directorships and executive roles, including chairman and interim chief executive officer of Western Dental Services, Inc., a senior advisor to New Mountain Capital, LLC, a private equity firm, chairman of the board and interim president of National Medical Health Card Systems, Inc., a pharmacy benefits manager, chairman of the board of Pathways, Inc., an operator of post-acute care facilities, chairman of the board of TransHealthcare, Inc., a health care services company, chairman and interim chief executive officer of LifeCare Health Partners, LLC, an operator of long-term acute care hospitals, interim president and chief executive officer of Luminex Corporation, interim president and chief executive officer of Omega Healthcare Investors, Inc., a healthcare focused real estate investment trust, and chairman of the board of Inmar, Inc., a reverse logistics and revenue recovery company. Mr. Erickson was also a cofounder, president and chief executive officer of CareSelect Group, Inc., a physician practice management company. Earlier in his career, Mr. Erickson held several management positions at American Hospital Supply Corporation. Mr. Erickson holds a Bachelors in Business Administration from the University of Iowa and an M.B.A. from Southern Methodist University.
>
> Mr. Erickson brings to the Board his experience in the healthcare industry, including his significant experience as chairman of the board of directors and chief executive officer of several healthcare-focused companies.

**Defendant Fish**

52.     Defendant Robert H. Fish ("Fish") has served as a Company director since April 18, 2017, and he is a member of the Audit Committee.

53.     According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Fish beneficially owned 7,571 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Fish owned approximately $169,287 worth of American Renal stock.

14

54.     For the 2017 fiscal year, Defendant Fish received $194,994 in compensation from the Company. This included $65,000 in cash fees and $129,994 in stock awards.

55.     The Company's 2018 Proxy Statement stated the following about Defendant Fish:

**Robert H. Fish** has served as a member of our Board of Directors since April 2017. Mr. Fish currently serves as the Chairman of the Board of Directors of Genesis Healthcare, Inc., a national provider of post-acute healthcare services ("Genesis"), and as a director of LifeCare Health Partners, LLC**,** a private long-term acute hospital company. Mr. Fish joined Skilled Healthcare Group, Inc., which was later acquired by Genesis**,** as the Chief Executive Officer in November 2013. Mr. Fish served as Skilled Healthcare's Chief Executive Officer until February 2015, when the combination of Skilled Healthcare and Genesis was completed**.** During his career, Mr. Fish has served as Chairman, President or Chief Executive Officer of a number of public and private healthcare services companies. From January 2012 until he joined Skilled Healthcare in November 2013, Mr. Fish served as Managing Partner of Sonoma-Seacrest, LLC, a California health care firm specializing in strategic planning, performance improvement and merger and acquisition matters. Mr. Fish's prior board positions include serving as the Chairman of REACH Medical Holdings, a regional air medical transport company, from 2008 to 2012, which was acquired by Air Medical Group Holdings; serving as the Executive Chairman of Coram, Inc., a large home infusion provider, from 2005 to 2006, until its sale to Apria; serving as a director of NeighborCare, Inc., a large institutional pharmacy, from 2003 to 2005, until its acquisition by Omnicare; and serving as the Lead Director of Genesis from 2003 to 2007. From October 2001 to May 2002, Mr. Fish served as a director and subsequently from 2002 to 2003, Mr. Fish served as Chairman and Chief Executive Officer of Genesis Health Ventures, a long-term care and institutional pharmacy company and predecessor in interest to Genesis. Mr. Fish also has extensive experience in hospital administration, having been President and Chief Executive Officer of St. Joseph Health System from 1995 to 1999 and Valley Care Health System from 1985 to 1995, as well as a member of the Board of Directors of the St. Helena Hospital Foundation, a philanthropic organization benefiting the St. Helena Hospitals in Napa Valley, since 2013. Mr. Fish received a Bachelor of Arts degree in Sociology from Whittier College and a Masters of Public Health degree in Hospital Administration from the University of California, Berkeley.

Mr. Fish brings to the Board his extensive experience in the healthcare services industry generally and, in particular, his public company directorial experience as a director, lead director and executive chairman and his roles as chief executive.

**Defendant Hendricks**

56.     Defendant Jared S. Hendricks ("Hendricks") has served as a Company director since 2010. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

57.     Defendant Hendricks is employed as a senior managing director by Centerbridge, the Company's controlling shareholder. Because of Defendant Hendrick's employment with Centerbridge, the Company does not provide him with additional compensation in connection with his service on the Board.

58.     The Company's 2018 Proxy Statement stated the following about Defendant Hendricks:

> **Jared S. Hendricks** has served as a member of our Board of Directors since 2010. Mr. Hendricks also serves on the boards of directors of IPC Corp. and Ligado Networks LLC. Mr. Hendricks joined Centerbridge Partners, L.P., an investment management firm employing a flexible approach across investment disciplines-from private equity to credit and related strategies, and real estate, in 2006 and has served as a Senior Managing Director since 2014. Prior to joining Centerbridge Partners, L.P., from 2004 to 2006, Mr. Hendricks was an Associate at Silver Lake Partners, a private equity firm focused on investments in technology and related growth companies. Prior to joining Silver Lake, he was an investment banking analyst within the Global Industrial and Services group at Credit Suisse First Boston. Mr. Hendricks graduated summa cum laude from The Wharton School of the University of Pennsylvania where he received a B.S. in Economics.
>
> In nominating Mr. Hendricks for election as a director, the Board considered his significant experience in working with companies controlled by private equity sponsors, particularly in the healthcare industry, and his extensive financial background.

**Defendant Jureller**

59.     Defendant John M. Jureller ("Jureller") has served as a Company director since 2015, and he serves as the Chair of the Audit Committee.

60.     According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Jureller beneficially owned 21,434 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Jureller owned approximately $479,264 worth of American Renal stock.

61.     For the 2017 fiscal year, Defendant Jureller received $314,999 in compensation from the Company. This included $75,000 in cash fees and $239,999 in stock awards.

62.     The Company's 2018 Proxy Statement stated the following about Defendant Jureller:

> **John M. Jureller** has served as a member of our Board of Directors since August 2015. Mr. Jureller also serves on the board of directors of White Plains Hospital in White Plains, NY and is the chairman of the finance committee as well as a member of the audit committee of the board of directors of White Plains Hospital. Mr. Jureller served on the audit committees of Studio Moderna Holdings B.V. from 2011 to 2012 and Torex Retail Holdings Ltd. from 2009 to 2012. Since November 2017, Mr. Jureller has served as a Managing Director at Accordion Partners, a financial advisory firm. Mr. Jureller was an independent financial and management consultant from November 2016 to November 2017, and prior to that served as the executive vice president and chief financial officer of Frontier Communications Corp. from January 2013 until November 2016. Prior to joining Frontier Communications Corp., Mr. Jureller served in a variety of senior financial roles with various companies including General Atlantic LLC, WestPoint International, Inc., AlixPartners, LLP, PepsiCo, Inc. and General Electric Capital Corporation. Mr. Jureller began his career with the corporate banking and leveraged finance groups at Bankers Trust Company. Mr. Jureller received a B.S. in Finance and an M.B.A. from Cornell University.
>
> In nominating Mr. Jureller for election as a director, the Board considered his extensive financial background and significant executive management experience at various public and private companies, including his experience as chief financial officer of a large, publicly traded company, which enables him to contribute valuable perspectives to our Board on financial, risk management, public reporting, compliance, investor relations, operational and other matters.

### Defendant Kamal

63.     Defendant Syed T. Kamal ("Kamal") has served as the President of the Company and a Company director since 1999. Defendant Kamal also served as the Company's Executive

Vice President from 1999 to 2005. According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Kamal beneficially owned 1,315,564 shares of the Company's common stock, which represented 4.0% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant Kamal owned approximately $29.4 million worth of American Renal stock.

64.     For the 2017 fiscal year, Defendant Kamal received $2,153,560 in compensation from the Company. This included $770,928 in salary, $499,928 in stock awards, $280,694 in option awards, $539,649 in non-equity incentive compensation, and $62,292 in all other compensation.

65.     The Company's 2018 Proxy Statement stated the following about Defendant Kamal:

> **Syed T. Kamal** is a co-founder of our Company and has served as our President and as a director of our Company since our inception in 1999. Mr. Kamal also served as Executive Vice President from 1999 to 2005. Mr. Kamal has more than 38 years of experience in the dialysis services industry. Prior to founding our company, Mr. Kamal served in various management roles at Fresenius Medical Care North America ("FMCNA"), including as President of FMCNA's southern business unit, Vice President of Operations for FMCNA's North America division, Director and Vice President of Operations for FMNCA's International division and Regional Manager of FMNCA's Mid-Atlantic and Southeast regions (U.S.). Mr. Kamal holds a B.A. degree in Economics and Statistics and an M.B.A. degree from the University of Punjab in Pakistan. In nominating Mr. Kamal for election as a director, the Board considered his experience as an executive in the dialysis services industry, in addition to his providing a management perspective to Board deliberations and valuable information about the status of our day-to-day operations given his role as our President.

### Defendant Ryan

66.     Defendant Patrick T. Ryan ("Ryan") has served as a Company director since May 2016, and serves as a member of the Audit Committee and the Compliance Committee.

67.      According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Ryan beneficially owned 21,434 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on March 8, 2018 was $22.36, Defendant

Ryan owned approximately $479,264 worth of American Renal stock.

68.     For the 2017 fiscal year, Defendant Ryan received $319,999 in compensation from

the Company. This included $80,000 in cash fees and $239,999 in stock awards.

69.     The Company's 2018 Proxy Statement stated the following about Defendant Ryan:

**Patrick T. Ryan** has served as a member of our Board of Directors since May
2016. Mr. Ryan's principal occupation, effective February 2012, is Chief Executive
Officer of Press Ganey Associates, Inc., whose principal business is health care
performance improvement solutions and consulting. Mr. Ryan has also served on
Press Ganey's Board of Directors since February 2012. Prior to joining Press
Ganey, Mr. Ryan served as the Chief Executive Officer of The Broadlane Group, a
healthcare cost management and supply chain organization, from 2008 until 2010.
Mr. Ryan served as Chief Executive Officer of PolyMedica Corporation, the parent
company of Liberty Medical Supply, a direct-to-consumer provider of diabetes
testing supplies and related services, from 2004 until 2007. In addition, Mr. Ryan
served as the Chairman and Chief Executive Officer of Physicians Dialysis, Inc.,
Chief Executive Officer of Principalcare, Inc., President and Chief Executive
Officer of ImageAmerica, Inc. and Co-Founder and President of R.B Diagnostics.
He began his career working for American Hospital Supply Corporation. Mr. Ryan
has served as a director of Affiliated Managers Group, Inc. since 2007, and is a
member of its audit, compensation and nominating committees. He is also a board
member of ChoiceOne Urgent Care, LLC. He has served on the boards of the
Massachusetts Hospital Association's Committee on Governance, Beth Israel
Deaconess Medical Center, Lahey Health and Atrius Health. Mr. Ryan earned a
B.A. from the University of Rochester.

Mr. Ryan brings to the Board his significant business and leadership experience,
including as the chief executive officer of Press Ganey.

**Defendant Silver**

70.     Defendant Steven M. Silver ("Silver") has served as a Company director since

2010, and he is a member of the Compensation Committee and the Nominating and Corporate

Governance Committee.

71.     Defendant Silver is employed as a senior managing director by Centerbridge, the

Company's controlling shareholder. Because of Defendant Silver's employment with

Centerbridge, the Company does not provide him with additional compensation in connection with his service on the Board.

72.     The Company's 2018 Proxy Statement stated the following about Defendant Silver:

**Steven M. Silver** has served as a member of our Board of Directors since 2010. Mr. Silver also serves on the boards of directors of KIK Custom Products Inc., Wok Holdings, Ltd., Reddy Ice Holdings, Inc., Remedi SeniorCare Holding Corporation, TriMark USA, LLC and White Plains Hospital. Mr. Silver joined Centerbridge Partners, L.P. as a Senior Managing Director in 2006. Prior to joining Centerbridge Partners, L.P., Mr. Silver was a Managing Director and Partner at Vestar Capital Partners, a private equity investment firm. Mr. Silver began his career as a member of the Mergers & Acquisitions department of Wasserstein Perella & Co. in New York and London. Mr. Silver received a B.A. from Yale College and an M.B.A. with high distinction from Harvard Business School in 1995, where he was a George F. Baker Scholar.

Mr. Silver brings to the Board his significant experience in working with companies controlled by private equity sponsors, particularly in the healthcare industry, and his extensive financial background.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

73.     By reason of their positions as officers and/or directors of American Renal and because of their ability to control the business and corporate affairs of American Renal, the Individual Defendants owed American Renal and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage American Renal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of American Renal and its shareholders so as to benefit all shareholders equally.

74.     Each director and officer of the Company owes to American Renal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

75.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of American Renal, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

76.     To discharge their duties, the officers, directors, and controllers of American Renal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

77.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of American Renal, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised American Renal's Board at all relevant times.

78.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

79.     To discharge their duties, the officers and directors of American Renal were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of American Renal were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Massachusetts, Delaware, and the United States, and pursuant to American Renal's own Code of Ethics and Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how American Renal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of American Renal and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that American Renal's operations would comply with all applicable laws and American Renal's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

80.     Each of the Individual Defendants further owed to American Renal and the shareholders the duty of loyalty requiring that each favor American Renal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

81.     At all times relevant hereto, the Individual Defendants were the agents of each other and of American Renal and were at all times acting within the course and scope of such agency.

82.     Because of their advisory, executive, managerial, directorial, and controlling positions with American Renal, each of the Individual Defendants had access to adverse, non-public information about the Company.

83.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by American Renal.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

85.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

86.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of American Renal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

87.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

88.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of American Renal, and was at all times acting within the course and scope of such agency.

## American Renal's Code of Ethics and Conduct

89.     The Company's Code of Ethics and Conduct (the "Code of Ethics") provides that it is "intended to guide the conduct of all ARA directors, officers, staff members, and physician and institutional partners," though the policies that apply specifically to directors are found in the Corporate Governance Guidelines.[5]

90.     The Code of Ethics emphasizes the importance of complying with relevant rules, regulations, and laws, stating that "[o]beying the law, both in letter and in spirit, is one of the foundations on which ARA's ethical standards are built."

91.     The Code of Ethics also provides a section on record-keeping which requires honest and accurate reporting of, *inter alia*, financial statements, Company books, and records:

> *Accuracy of Books and Records.* It is ARA's policy to make full, fair, accurate, timely and understandable disclosures in compliance with applicable laws and regulations in all reports and documents that ARA files with, or submits to, the U.S. Securities and Exchange Commission, and other governmental agencies, as well as in all other public communications made by ARA. In addition, as a company whose stock is publicly traded, ARA is subject to a number of laws and regulations that

---

[5] http://ir.americanrenal.com/~/media/Files/A/American-Renal/documents/governance/ara-company-code-of-ethics-april-2016.pdf. Last visited July 19, 2019.

govern our business records, including U.S. securities laws. ARA must record its financial activities in compliance with all applicable laws and accounting practices and provide current, complete and accurate information to any and all government agencies. No one may cause ARA to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no one may create any false or artificial documentation or book entry for any transaction entered into by ARA. Similarly, persons who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on ARA's books and records.

92.     Similarly, the Code of Ethics also commits American Renal to accurate public disclosures, stating, in relevant part:

*Public Communication By ARA*. As a publicly-traded company, ARA is committed to providing accurate and complete information to the public in compliance with legal requirements. Only authorized spokespersons may communicate material, non-public information of ARA's official position on topics such as financial performance, business strategy, development plans, operations status, legal matters and public policy issues.

93.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, or report violations of the Code of Ethics.

**American Renal's Corporate Governance Guidelines**

94.     The Corporate Governance Guidelines provide that "all directors owe a duty of loyalty to the Company," and reminds each Board member of his/her obligation to comply with the Company's general Code of Ethics.

## American Renal's Audit Committee Charter

95.    The Company's Audit Committee Charter provides that the Audit Committee's "responsibilities and duties" include, *inter alia*: "review[ing] the integrity of the Company's financial reporting processes" and "review[ing] with management and the independent registered public accounting firm the effect of regulatory and accounting initiatives on the financial statements of the Company."

96.    Regarding the Audit Committee's responsibilities and duties relating to financial reporting, the Audit Committee Charter provides that the Audit Committee must:

> …review the integrity of the Company's financial reporting processes. In that connection, the Committee must obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:
> - all critical accounting policies and practices to be used by the Company;
> - analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm;
> - major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;
> - major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and
> - any other material written communications between the independent registered public accounting firm and the Company's management.

97.    The Audit Committee Charter provides that final responsibility for the accuracy of American Renal's financial statements belongs to management and its accounting firm. Thus, the oversight failing of the Audit Committee may be imputed to the entire Board.

…the Committee is not responsible for certifying the Company's financial statements or guaranteeing the independent registered public accounting firm's report. The fundamental responsibility for the Company's financial statements and disclosures rests with management while the independent registered accounting firm is responsible for conducting the annual audit in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB").

98.     In contravention of their duties as members of the Audit Committee, Defendants Jureller, Fish, and Ryan failed to oversee the integrity of the Company's financial statements and allowed the Company to operate with inadequate internal controls, resulting in improper revenue recognition which required an investigation overseen by the Audit Committee to review of certain revenue recognition items with respect to the fiscal quarter ended March 31, 2018, as well as previous quarters.

### American Renal's Compliance Committee Charter

99.     The Company's Compliance Committee Charter provides that the Committee's main duties include the review of the Code of Ethics, the Compliance Reference Manual, the annual Compliance Work Plan, and the Charter itself, for the purpose of "implementing and overseeing… [the Company's] compliance with legal and regulatory requirements applicable to their operations…"

100.    In contravention of their duties as members of the Compliance Committee, Defendants Boxer, Erickson, and Ryan failed to oversee the Company's compliance with the Exchange Act and allowed the Company to misrepresent the state of its internal controls.

### INDIVIDUAL DEFENDANTS' MISCONDUCT

#### Background

101.    American Renal operates over 200 clinics that offer dialysis services for thousands of patients suffering from end-stage renal disease across 26 states and the District of Columbia.

The Company operates through joint venture partnerships with physicians, primarily local nephrologists, i.e. physicians specializing in kidney disease and overall health.

102.    Dialysis is a process to artificially remove toxins, fluid, and salt from the blood. It is generally required for patients undergoing end-stage renal disease on a continual basis, often times at least three times a week for the duration of the patient's life until/unless the patient receives a kidney transplant.

103.    The Company is effectively controlled by Centerbridge, which as of March 8, 2018, held 54.9% of American Renal's common stock. Under the Company's Amended and Restated Certificate of Incorporation, Centerbridge has the power:

> to elect a majority of the members of [American Renal's] board of directors and thereby control [its] policies and operations, including the appointment of management, future issuances of [the Company's] common stock or other securities, the payment of dividends, if any, on [its] common stock, the incurrence or modification of debt by [the Company], amendments to [its] amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions…

104.    Indeed, several of the Individual Defendants are employees of Centerbridge.

105.    Centerbridge will retain this power until American Renal ceases to be a controlled company under the standards of the NYSE (or whichever exchange the Company then trades upon).

**Failure to Hold Stockholders' Meeting**

106.    The annual meeting of shareholders of American Renal was last held on May 2, 2018.

107.    Section 2.01 of Article II of the Company's Amended and Restated Bylaws states that:

> Annual meetings of stockholders may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board of Directors

shall determine and state in the notice of meeting. The Board of Directors may, in its sole discretion, determine that meetings of the stockholders shall not be held at any place, but may instead be held solely by means of remote communication as described in Section 2.11 of these Bylaws in accordance with Section 211(a)(2) of the General Corporation Law of the State of Delaware (the "DGCL").

108.    Pursuant to Title 8 of the Delaware Code Annotated ("Del. C.") §211(c), American Renal is required to hold an annual meeting of stockholders at least once every 13 months:

> If the annual meeting for election of directors is not held on the date designated therefor or action by written consent to elect directors in lieu of an annual meeting has not been taken, the directors shall cause the meeting to be held as soon as is convenient. If there be a failure to hold the annual meeting or to take action by written consent to elect directors in lieu of an annual meeting for a period of 30 days after the date designated for the annual meeting, or if no date has been designated, *for a period of 13 months after the latest to occur of the organization of the corporation, its last annual meeting* or the last action by written consent to elect directors in lieu of an annual meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder or director.

(Emphasis added.)

109.    In violation of Delaware law, the Individual Defendants caused the Company to fail to hold its annual stockholders' meeting for over 13 months.

110.    As of the date of filing this Complaint, the Company has not even provided stockholders notice of the next annual stockholders' meeting.

111.    In causing the Company to fail to hold the annual stockholders' meeting, the Defendants prevented the stockholders from having the opportunity to elect a Board of Directors that is not breaching its fiduciary duties to the Company and the stockholders.

**False and Misleading Statements**

112.    Beginning in early August 2016, American Renal issued multiple statements through SEC filings indicating that there were no material weaknesses in its internal controls over financial reporting.

*August 9, 2016 Form 10-Q*

113.    The Company filed its 2Q16 with the SEC on August 9, 2016 for the period ended June 30, 2016. The 2Q16 was signed by Defendant Wilcox.

114.    The 2Q16 assured investors that there had been no changes in the Company's internal controls over its financial reporting, stating, in relevant part:

> There have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities and Exchange Act) during the quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

115.    In describing its accounting policies in connection with collections and revenue recognition, the 2Q16 described the Company's use of the allowance method in accounting for uncollectible accounts. This practice entails estimating the amount that customers would be unable to pay and recording this value in the same financial period that the purchase of service is first made.[6] The 2Q16 stated, in relevant part:

> *Provision for uncollectible accounts*. Patient service operating revenues are reduced by the provision for uncollectible revenues to arrive at net patient service operating revenues. Provision for uncollectible accounts represents reserves established for amounts for which patients are primarily responsible that we believe will not be collectible.
> Contractual allowances, along with provisions for uncollectible amounts, are estimated based upon contractual terms, regulatory compliance and historical collection experience. Net revenue recognition and allowances for uncollectible billings require the use of estimates of the amounts that will actually be realized.

116.    Attached to the 2Q16 were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Carlucci and Wilcox, attesting to the accuracy of the 2Q16.

---

[6] https://www.principlesofaccounting.com/chapter-7/uncollectible-receivables/. Last visited July 22, 2019.

117.     American Renal repeated verbatim its assurances about its internal controls and its statement as to its accounting for uncollectible accounts in the following Form 10-Q for the quarterly period ended September 30, 2016, which was filed with the SEC on November 10, 2016 (the "3Q16"). The 3Q16 was signed by Defendant Wilcox and contained SOX certifications signed by Defendants Carlucci and Wilcox attesting to the accuracy of the 3Q16.

### March 8, 2017 Form 10-K

118.     The Company filed its 2016 10-K with the SEC on March 8, 2017. The 2016 10-K was signed by Defendants Carlucci, Kamal, Wilcox, Boucher, Silver, Hendricks, Boxer, Erickson, Jureller, and Ryan.

119.     Again addressing American Renal's internal controls, the 2016 10-K reassured investors that its internal controls had remained unchanged:

> There have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) during the quarter ended December 31, 2016 that have materially affected, or are reasonably likely to affect, our internal control over financial reporting.

120.     The 2016 10-K essentially repeated its statement of policy regarding collections and revenue recognition, adding a final sentence stating that initial estimates are subject to change. The 2016 10-K stated, in relevant part:

> *Provision for uncollectible accounts*. Patient service operating revenues are reduced by the provision for uncollectible revenues to arrive at net patient service operating revenues. Provision for uncollectible amounts represents reserves established for amounts for which patients are primarily responsible that we believe will not be collectible.
> Contractual allowances, along with provisions for uncollectible amounts, are estimated based upon net contractual terms, regulatory compliance and historical collection experience. Net revenue recognition and allowances for uncollectible billings require the use of estimates of the amounts that will actually be realized. Changes in estimates are reflected in the then-current financial statements and realizations depending on the nature and predictability of the estimates and contingencies.

121.    Attached to the 2016 10-K were SOX certifications signed by Defendants Carlucci and Wilcox, attesting to the accuracy of the 2016 10-K.

122.    American Renal repeated verbatim its assurances about its internal controls and its statement as to its accounting for uncollectible accounts in the following Form 10-Q filings for the quarterly periods ended March 31, 2017, June 30, 2017, and September 30, 2017.

***May 1, 2017 Proxy Statement***

123.    On May 1, 2017, the Company filed its 2017 Proxy Statement. Defendants Boxer, Carlucci, Clark, Erickson, Fish, Hendricks, Jureller, Kamal, Ryan, and Silver solicited the 2017 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

124.    The 2017 Proxy Statement stated, regarding the Company's Code of Ethics, that:

> We have adopted a written Code of Ethics and Conduct that applies to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer and other senior executive officers, as well as our physician and institutional partners. The Code of Ethics and Conduct sets forth our policies and expectations on a number of topics, including our obligations to our patients and relations with referral and other courses, other conflicts of interest, compliance with laws, use of our assets, our business practices, protecting our shareholders and our compliance program. A current copy of the Code of Ethics and Conduct is posted on our website, which is located at www.americanrenal.com. If we ever were to amend or waive any provision of our Code of Ethics and Conduct that applies to our principal executive officer, principal financial officer, principal accounting officer or any person performing similar functions, we intend to satisfy our disclosure obligations, if any, with respect to any such waiver or amendment by posting such information on our website at www.americanrenal.com rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website.

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

125.   The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as multiple Individual Defendants allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

126.   The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards that "cause[] more compensation to be 'at risk' and further align[] our executive compensation with our long-term profitability and creation of shareholder value," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

127.   The 2017 Proxy Statement also failed to disclose that: (1) The Company's internal control over financial reporting contained material weaknesses, (2) American Renal was not, *inter alia*, preparing its financial statements in accordance with GAAP, as such, the Company would become the subject of heightened regulatory scrutiny and an SEC investigation pertaining to its revenue recognition practices, collections, and matters connected thereto, (3) the Company's financial statements reported in annual and quarterly reports filed with the SEC from 2016 through the date of the 2017 Proxy Statement at least were incorrect and unreliable, and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*March 6, 2018 Form 10-K*

128.   The Company filed its 2017 10-K with the SEC on March 6, 2018. The 2017 10-K was signed by all of the Individual Defendants.

129.    The 2017 10-K repeated American Renal's assurance that "management [had] concluded that [the Company's] internal control over financial reporting was effective as of December 31, 2017," and that "have been no changes in [its] internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting."

130.    The 2017 10-K repeated verbatim the same statement about its uncollectible accounts allowance that it had disclosed since its 2016 10-K a year prior. The 2017 10-K stated, in relevant part:

> *Provision for uncollectible accounts.* Patient service operating revenues are reduced by the provision for uncollectible revenues to arrive at net outpatient service operating revenues. Provision for uncollectible accounts represents reserves established for amounts for which patients are primarily responsible that we believe will not be collectible.
>
> Contractual allowances, along with provisions for uncollectible amounts, are estimated based upon contractual terms, regulatory compliance and historical collection experience. Net revenue recognition and allowances for uncollectible billings requires use of estimates of the amounts that will actually be realized. Changes in estimates are reflected in the then-current financial statements based on on-going actual experience trends, or subsequent settlements and realizations depending on the nature and predictability of the estimates and contingencies.

131.    Despite purported increased scrutiny the Company stated it applied to its revenue accounting due to the adoption of Topic 606,[8] the Individual Defendants failed to correct the problems in American Renal's accounting practices and its internal controls over its financial reporting.

132.    Attached to the 2017 10-K were SOX certifications signed by Defendants Carlucci and Wilcox, attesting to the accuracy of the 2017 10-K.

---

[8] A new accounting measure first issued by the Financial Accounting Standards Board ("FASB") (also referred to as ASU 2014-19), which changed the required timing of revenue recognition for customer contracts.

*March 16, 2018 Proxy Statement*

133.    On March 16, 2018, the Company filed its 2018 Proxy Statement with the SEC. Defendants Boxer, Carlucci, Clark, Erickson, Fish, Hendricks, Jureller, Kamal, Ryan, and Silver solicited the 2018 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

134.    The 2018 Proxy Statement stated, regarding the Company's Code of Ethics, that:

> We have adopted a written Code of Ethics and Conduct that applies to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer and other senior executive officers, as well as our physician and institutional partners. The Code of Ethics and Conduct sets forth our policies and expectations on a number of topics, including our obligations to our patients and relations with referral sources and others, other conflicts of interest, compliance with laws, use of our assets, our business practices, protecting our shareholders and our Compliance Program. A current copy of the Code of Ethics and Conduct is posted on our website at www.americanrenal.com under "Investor Relations: Corporate Governance: Governance Documents: Code of Ethics and Conduct." If we ever were to amend or waive any provision of our Code of Ethics and Conduct that applies to our principal executive officer, principal financial officer, principal accounting officer or any person performing similar functions, we intend to satisfy our disclosure obligations, if any, with respect to any such waiver or amendment by posting such information on our website at www.americanrenal.com rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website.

135.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as multiple Individual Defendants allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

136.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards that "cause[] more compensation to be 'at risk' and further align[] [their] executive compensation with [the Company's] long-term profitability and the creation of shareholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

137.   The 2018 Proxy Statement also failed to disclose that: (1) The Company's internal control over financial reporting contained material weaknesses, (2) American Renal was not, *inter alia*, preparing its financial statements in accordance with GAAP, as such, the Company would become the subject of heightened regulatory scrutiny and an SEC investigation pertaining to its revenue recognition practices, collections, and matters connected thereto, (3) the Company's financial statements reported in annual and quarterly reports filed with the SEC from 2016 through the date of the 2018 Proxy Statement at least were incorrect and unreliable, and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 8, 2018 Form 10-Q*

138.   The Company filed its 1Q18 with the SEC on May 8, 2018. The 1Q18 was signed by Defendant Wilcox.

139.   The 1Q18 assured investors that there had been no changes in the Company's internal controls over its financial reporting, stating, in relevant part:

> There have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities and Exchange Act) during the quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

140.    Attached to the 1Q18 were SOX certifications signed by Defendants Carlucci and Wilcox, attesting to the accuracy of the 1Q18.

**August 7, 2018 Form 10-Q**

141.    American Renal repeated verbatim its assurances about its internal controls and its statement as to its accounting for uncollectible accounts in the following quarterly report for the period ended June 30, 2018, which was filed with the SEC on a Form 10-Q on August 7, 2018 (the "2Q18"). The 2Q18 was signed by Defendant Wilcox, and contained SOX certifications signed by Defendants Carlucci and Wilcox attesting to its accuracy.

142.    The statements in ¶¶ 114-122, 128-132, and 139-141 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) The Company's internal control over financial reporting contained material weaknesses, (2) American Renal was not, *inter alia*, preparing its financial statements in accordance with generally acceptable accounting principles ("GAAP"), as such, the Company became the subject of heightened regulatory scrutiny and an SEC investigation pertaining to its revenue recognition practices, collections, and matters connected thereto, (3) the Company's financial statements reported in annual and quarterly reports filed with the SEC from 2016 through 2018 at least were incorrect and unreliable, and (4) the Company failed to maintain internal controls.

143.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

144.     Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

145.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

**The Truth Begins to Emerge while False and Misleading Statements Continue**

***November 9, 2018 Form 10-Q***

146.     The Company filed its 3Q18 with the SEC on November 9, 2018. The 3Q18 was signed by Defendant Boucher.

147.     The 3Q18 maintained that American Renal's internal control over its financial reporting remained sufficient, stating, in relevant part:

> There have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) under the Exchange Act) during the quarter ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

148.     However, the 3Q18 went on to reveal that "in October 2018, the Staff of the Securities and Exchange Commission requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collections and related matters," prompting concern that the Company would have to restate its financials or take other expensive measures to bring itself into compliance with the SEC.

149.     Attached to the 3Q18 were SOX certifications signed by Defendants Carlucci and Boucher, attesting to the accuracy of the 3Q18.

150.     Upon this news of regulatory scrutiny, American Renal's price per share dropped by $0.74 (over 4%), from a close of $17.50 on November 9, 2018 to close at $10.46 on November 12, 2018.

**The Truth Continues to Emerge**

151.    On March 8, 2019, before market open, the Company filed a current report on a Form 8-K and a Notification of Late Filing on a Form 12b-25 (the "Form NT 10-K") with the SEC disclosing that it would be unable to timely file its periodic report for the 2018 fiscal year. In explanation, American Renal cited the SEC's ongoing inquiry into the Company's financials, and the corresponding need to complete its own analysis of its earlier accounting practices.

152.    The Form NT 10-K disclosed that the results of the Company's Audit Committee examination could affect items on American Renal's balance sheets such as revenue and accounts receivable for the fiscal years 2014 to 2017 and the first three quarters of fiscal 2018. The Form NT 10-K stated, in relevant part:

> The Audit Committee's review is continuing. With the assistance of its advisors, *the Audit Committee is examining the reserve computations and other accounting practices that could have an impact on accounts receivable and revenue for the fiscal year ended December 31, 2018, as well as the previously reported fiscal years ended December 31, 2014, 2015, 2016, and 2017, the fiscal quarters within those fiscal years and the first three fiscal quarters of 2018*. The Audit Committee is continuing to evaluate whether and how any such adjustments will affect individual quarters and years during the affected period, and the Company does not expect to comment further on the Audit Committee's review until it is completed.
>
> Due to the ongoing Audit Committee review, the Company has been unable to complete its preparation and review of the Form 10-K in time to file it within the prescribed time period without unreasonable effort or expense. The Audit Committee and the Board are working diligently to complete their review so that the Company can file its Form 10-K and make any related disclosures as promptly as practicable.

(Emphasis added).

153.    In response to this news, the price per share of American Renal stock dropped $2.05 (over 16%) from a close of $12.51 on March 7, 2019 to close at $10.46 on March 8, 2019. The Company's share price further declined over the next trading day, closing at $9.79 on March 11, 2019.

154.     Soon after, on March 27, 2019, American Renal filed the March 27, 2019 8-K announcing the Board's conclusion that the Company's previously issued financial data for the fiscal years 2014 through 2017 and the Company's quarterly reports for those periods as well as the periods ended March 21, June 30, and September 30, 2018 as reported in the Company's annual and quarterly reports discussed herein were no longer deemed reliable. Furthermore, the March 27, 2019 8-K stated that managements' prior assessments of internal control over financial reporting were also no longer reliable due to the Audit Committee's recommendation and review of the Company's accounting practices at issue in connection with the SEC's production request.

155.     The Audit Committee examination conducted with the assistance of the Company's legal counsel and independent accounting advisors retained by the Audit Committee's counsel revealed that the Company's practice of recording expected revenue from third parties resulted in improper reconciliation of its contractual allowance estimates for discounts and certain price concessions.

156.     Furthermore, the Company failed to consistently record reserves for uncollectable accounts across all "payer categories[.]" The Company estimated that the net cumulative impact of the improper accounting practices before income taxes would be between negative $5 million and positive $5 million.

157.     Turning to the core issues in American Renal's financial reporting, the March 27, 2019 8-K disclosed that the Company had improperly recorded revenue and had failed to input its uncollectible reserves across all of its customer groups. The March 27, 2019 8-K stated, in relevant part:

> The [Audit Committee's] principal findings to date include the following:
> - ***In recording revenue based on expected payments from third-party payers during the Non-Reliance Periods, the Company did not appropriately reconcile its contractual allowance estimates for discounts and price***

> *concessions with cash subsequently received in respect of prior period patient claims. In addition, the Company did not record a reserve for uncollectible accounts across all of its payer categories during the Non-Reliance Periods.*

(Emphasis added).

158.    In discussing the anticipated effects of these accounting errors on the Company's previously released financial statements, the March 27, 2019 8-K disclosed that the anticipated effect of the change on its previously released financial results was expected to be positive for the fiscal years 2013 to 2016 and negative for the fiscal years 2017 and 2018 (the initial results for the latter remain unreleased). The March 27, 2019 8-K stated that the following "reflects an estimated impact on operating income and income before taxes of:"

- *negative $13-23 million for the fiscal year ended December 31, 2018, which has not yet been reported, and negative $15-25 million for the previously reported nine months ended September 30, 2018;*
- *negative $10-20 million for the fiscal year ended December 31, 2017;*
- positive $16-26 million for the fiscal year ended December 31, 2016;
- positive $8-18 million for the fiscal year ended December 31, 2015; and
- a relatively neutral impact for the fiscal year ended December 31, 2014.

The Company also estimates that the cumulative, net impact of these matters on operating income and income before income taxes for the fiscal year ended December 31, 2013 and prior fiscal years is a positive $14-24 million, which, before the effect of income tax expense (benefit) and change in the difference between the redemption value and estimated fair value of noncontrolling interests, would result in a reduction of accumulated deficit in an equivalent amount for the Non-Reliance Periods as a whole. In addition, the Company expects the impact on net accounts receivable as of the end of each fiscal year included in the Non-Reliance Periods to be material and estimates that the impact on net accounts receivable as of September 30, 2018, the last balance sheet reported by the Company, to be a positive $11-21 million. The Company has not yet finalized its quantification of the impact for the fiscal periods described above, nor has it finalized its quantification of the impact for individual fiscal quarters within the Non-Reliance Periods.

(Emphasis added.)

159.    Attached to the March 27, 2019 8-K was a press release dated March 27, 2019 issued on the Company's website the same day. The press release provided an update on the Audit

Committee review and its preliminary findings. Both the March 27, 2019 8-K and the press release provided further disclosure regarding, *inter alia*, the immediate resignation of American Renal's CFO (Defendant Boucher) and the Company's inability to timely file its annual report for the 2018 fiscal year.

160.    The press release, in relation to Defendant Boucher's resignation and the ongoing Audit Committee investigation, stated the following:

> BEVERLY, MA (March 27, 2019) - American Renal Associates Holdings, Inc. (NYSE: ARA) (the "Company"), a leading provider of outpatient dialysis services, today announced an update with respect to the previously disclosed review that is being conducted by the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of the Company. The Company also announced the resignation of Jason Boucher as Vice President and Chief Financial Officer, effective March 26, 2019, and the appointment of Mark Herbers to the role of Interim Chief Financial Officer and Interim Chief Accounting Officer, effective March 26, 2019.
>
> **Update on the Review Being Conducted by the Audit Committee of the Board of Directors and Restatement**
> On March 21, 2019, the Board concluded that the Company's previously issued consolidated financial statements and other financial data for the fiscal years ended December 31, 2014, 2015, 2016 and 2017 contained in its Annual Reports on Form 10-K for the years ended December 31, 2016 and 2017, and its condensed consolidated financial statements for the quarters and year-to-date periods ended March 31, June 30 and September 30, 2016; March 31, June 30 and September 30, 2017; and March 31, June 30 and September 30, 2018 contained in its Quarterly Reports on Form 10-Q (collectively, the "Non-Reliance Periods") should be restated and should no longer be relied upon for the reasons described below. The Board also determined that ***the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods, including management's assessment of internal control over financial reporting, should no longer be relied upon.*** The determination by the Board was made upon the recommendation of the Audit Committee as a result of the review described below.
>
> As previously disclosed, in October 2018, the Staff of the Securities and Exchange Commission ("SEC") requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collections and related matters. Following receipt of the SEC request, the Company responded by producing documents and information to the Staff and expects to continue to cooperate with the SEC by providing additional documents and information to the Staff in the future. In addition, as previously disclosed in the Company's Current

Report on Form 8-K filed March 8, 2019, the Audit Committee began an examination of the Company's revenue recognition methodology and related accounting matters, such as internal control over financial reporting related to revenue recognition and related matters, with the assistance of legal counsel that reports to the Audit Committee, as well as independent accounting advisors retained by the Audit Committee's counsel.

(Emphasis added).

161.    The press release further admitted that the Company was not yet certain as to the effect that its investigation would have on its restated financial results, also admitting that American Renal's earlier financial statements for the fiscal years 2014 to 2017, and the first three quarters of 2018, were not in accordance with GAAP. The press release stated, in relevant part:

The Company has not yet finalized its quantification of the impact for the fiscal periods described above, nor has it finalized its quantification of the impact for individual fiscal quarters within the Non-Reliance Periods.

- In addition, the Audit Committee continues to review additional accounting matters having to do with revenue recognition and accrued expenses and other current liabilities for the Non-Reliance Periods as they relate to revenue recognition. The Company continues to quantify the impact of these matters for the Non-Reliance Periods, which could be material to accrued expenses and other current liabilities and to operating income and income before income taxes for the Non-Reliance Periods. For the avoidance of doubt, any impact of these matters is not included in the estimated cumulative, net impact, or the impact for any of the fiscal periods described above, of expected corrections to contractual allowances and reserves for uncollectible accounts described above.
- The findings of the Audit Committee's review are also expected to require revised calculations of related metrics such as revenue per treatment and days sales outstanding throughout the Non-Reliance Periods. The restated amounts and metrics may have an ancillary impact on other reported amounts in the financial statements.
- As a result of the foregoing, *the Company's consolidated financial statements for the Non-Reliance Periods were not prepared in accordance with generally accepted accounting principles ("GAAP") and should not be relied upon.* In addition, *the Company's lack of adequate internal control over financial reporting relating to these matters for the Non-Reliance Periods constituted one or more material weaknesses in internal control over financial reporting.*

(Emphasis added).

162.    On this news, the price per share of American Renal stock dropped $3.69 (over 38%), from a close of $9.70 on March 27, 2019 to close at $6.01 on March 28, 2019.

163.    On March 29, 2019, the Company filed another current report with the SEC on a Form 8-K, this time announcing that the Company had received a subpoena from the SEC requiring American Renal to produce additional documents related to the accounting matters disclosed in the March 27, 2019 8-K. The report also disclosed the Securities Class Action.

164.    As of the time of filing this Complaint, there has been no restatement of any prior financial period, and the Company has yet to publish its annual report for the fiscal year 2018 or its quarterly report for the quarter ended March 31, 2019, which was due in May. For both of these periods, American Renal released unaudited balance sheets on two Form 8-Ks published on April 25, 2019 and May 15, 2019, respectively.

## Damages to American Renal

165.    As a direct and proximate result of the Individual Defendants' conduct, American Renal has lost and will continue to lose and expend many millions of dollars.

166.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, its CEO and Chairman and two of its Former CFOs, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, including resulting from the SEC subpoena.

167.    Further, these expenditures include the costs of the investigation into certain revenue recognition items overseen by the Audit Committee, and the costs of restating the Company's financial results for the fiscal years 2014, 2015, 2016, 2017, and three quarters of 2018 as stated in the Company's 2016 and 2017 10-Ks and quarterly reports discussed herein.

168.     Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

169.     As a direct and proximate result of the Individual Defendants' conduct, American Renal has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

170.     Plaintiff brings this action derivatively and for the benefit of American Renal to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of American Renal, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

171.     American Renal is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

172.     Plaintiff is, and has been at all relevant times, a shareholder of American Renal. Plaintiff will adequately and fairly represent the interests of American Renal in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

173.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

174.    A pre-suit demand on the Board of American Renal is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten Individual Defendants: Carlucci, Kamal, Boxer, Clark, Erickson, Fish, Hendricks, Jureller, Ryan, and Silver (collectively, the "Directors").

175.    Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

176.    Demand is excused as to all of the Directors because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

177.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

178.    Demand is excused because during and after the Directors breached their fiduciary duties as set forth herein, they caused the Company to violate Delaware law by failing to hold an annual stockholders' meeting since May 2, 2018, thus preventing the stockholders from having the opportunity to elect a Board of Directors that was not breaching its fiduciary duties to the Company and its stockholders.

179.     Additional reasons that demand on Defendant Carlucci is futile follow. Defendant Carlucci co-founded American Renal with Defendant Kamal, and he has served as its CEO and Chairman since 1999. Thus, as the Company admits, he is a non-independent director. American Renal provides Defendant Carlucci with his principal occupation, and he receives handsome compensation, including over $3.3 million during the 2017 fiscal year. Defendant Carlucci personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed and for which he signed SOX certifications, and all of the quarterly reports discussed herein. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Carlucci breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

180.     Additional reasons that demand on Defendant Kamal is futile follow. Defendant Kamal co-founded American Renal with Defendant Carlucci, and he has been its President and a Company director since 1999. Thus, as the Company admits, he is a non-independent director. American Renal provides Defendant Kamal with his principal occupation, and he receives handsome compensation, including over $2.1 million during the 2017 fiscal year. Defendant Kamal personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed. As the President of the Company and a trusted director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

For these reasons, Defendant Kamal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Boxer is futile follow. Defendant Boxer has served as a Company director since 2010, and serves as the Chair of the Compliance Committee. Defendant Boxer receives handsome compensation, including $322,999 during the 2017 fiscal year. From 2011 to 2018, Defendant Boxer also served as an independent contractor to Centerbridge, acting as a Senior Advisor for which he received compensation. His connection to Centerbridge, the Company's controlling shareholder, and the compensation he receives therefrom, further supports his inability to approach the misconduct alleged herein independently. Defendant Boxer personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed. As a trusted Company director and Chair of the Compliance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Boxer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since April 2017. Defendant Clark is employed by Centerbridge as General Counsel and as a Senior Managing Director, which provides her with her principal occupation. Her connection to Centerbridge, the Company's controlling shareholder, further supports her inability to approach the misconduct alleged herein independently. Defendant

Clark personally made many of the false and misleading statements, including those in the 2017 10-K, which she signed. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Clark breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Erickson is futile follow. Defendant Erickson has served as a Company director since 2011, and serves as Chair of the Compensation Committee. He is also a member of the Compliance Committee and the Nominating and Corporate Governance Committee. Defendant Erickson receives handsome compensation, including $329,999 during the 2017 fiscal year. Defendant Erickson personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed. As a trusted Company director and member of the Compliance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Erickson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Fish is futile follow. Defendant Fish has been a Company director since April 18, 2017 and is a member of the Audit Committee. Defendant Fish receives handsome compensation, including $194,994 during the 2017 fiscal year. Defendant Fish personally made many of the false and misleading statements, including those in

the 2017 10-K, which he signed.  As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Fish breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.    Additional reasons that demand on Defendant Hendricks is futile follow. Defendant Hendricks has served as a Company director since 2010. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Hendricks is employed by Centerbridge as a Senior Managing Director, which provides him with his principal occupation. His connection to Centerbridge, the Company's controlling shareholder, further supports his inability to approach the misconduct alleged herein independently. Defendant Hendricks personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Hendricks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.    Additional reasons that demand on Defendant Jureller is futile follow. Defendant Jureller has been a Company director since 2015 and is the Chair of the Audit Committee. Defendant Jureller receives handsome compensation, including $314,999 during the 2017 fiscal

year. Defendant Jureller personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed.  As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Jureller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Ryan is futile follow. Defendant Ryan has been a Company director since 2016 and is a member of the Audit Committee and the Compliance Committee. Defendant Ryan receives handsome compensation, including $319,999 during the 2017 fiscal year. Defendant Ryan personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed.  As a trusted Company director and member of both the Audit Committee and the Compliance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ryan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Silver is futile follow. Defendant Silver has served as a Company director since 2010. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant

Silver is employed as a Senior Managing Director by Centerbridge, which provides him with his principal occupation. His connection to Centerbridge, the Company's controlling shareholder, further supports his inability to approach the misconduct alleged herein independently. Defendant Silver personally made many of the false and misleading statements, including those in the 2016 and 2017 10-Ks, which he signed.  As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Silver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on the Board is futile follow.

190.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, in addition to their directorships at American Renal, Defendants Jureller and Silver serve together on the board of White Plains Hospital. Defendant Silver also serves on the board at Remedi Senior Care, where Defendant Boxer currently presides over him as Chairman of the Board. Additionally, Defendants Boxer and Fish were both directors at Genesis Healthcare from 2013 to 2015, with Defendant Fish taking over Defendant Boxer's position as Chairman after his retirement. Other associations stretch back further in time: Defendants Carlucci and Kamal, who have worked together since their tenure as executives at Fresenius Medical Care North America ("FMCNA") in the 1990s are unlikely to take action against each other and themselves as co-founders of American Renal.

191.    Furthermore, Defendants Carlucci, Kamal, Boxer, and Erickson are intertwined in Company transactions and are entitled to certain additional economic benefits resulting from an agreement involving the Company and Term Loan Holdings, LLC ("TLH"). Each of the Directors identified in this paragraph own interests in TLH and are thereby included in the Company's loan servicing agreement with TLH, "TLH Interests and Loan Agreement."

192.    Additionally, the Company is party to an amended and restated stockholders agreement with Centerbridge and Defendants Kamal and Carlucci whereby until Centerbridge ceases to control the Company, Centerbridge shall continue to nominate Carlucci and Kamal as directors of the Company pursuant to certain terms.

193.    These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

194.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, and conduct business in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

195.    Defendants Fish, Jureller, and Ryan breached their fiduciary duties as members of the Audit Committee at the time that the false and misleading statements alleged above were made. The Audit Committee charter requires that the Committee monitor the integrity of the Company's

financial reporting process, systems of internal control regarding finance, accounting and legal compliance, monitor compliance with legal and regulatory requirements, and review the Company's annual audited financial statements prior to distribution, among other things. As members of the Audit Committee, Defendants Fish, Jureller, and Ryan breached their fiduciary duties by failing to ensure that revenue was properly recognized in compliance with GAAP, resulting in an SEC inquiry (as well as an investigation by their own Committee), and by allowing the Company to make the improper statements discussed above. Indeed, each of the periodic reports which the Company indicated could no longer be relied upon in its March 27, 2019 Form 8-K, were filed under the oversight of Defendants Fish, Jureller, and Ryan as members of the Audit Committee. Thus, Defendants Fish, Jureller, and Ryan each face a substantial likelihood of liability arising from their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

196.    Defendants Boxer, Erickson, and Ryan breached their fiduciary duties as members of the Compliance Committee at the time that the false and misleading statements alleged above were made. The Compliance Committee charter requires that the Committee monitor American Renal's adherence to relevant rules and regulations. As members of the Compliance Committee, Defendants Boxer, Erickson, and Ryan breached their fiduciary duties by failing to ensure that the Company's SEC filings followed relevant laws, resulting in an investigation overseen by the Audit Committee, and by allowing the Company to make the improper statements discussed above. Indeed, each of the periodic reports which the Company indicated could no longer be relied upon in its March 27, 2019 Form 8-K, were filed under the oversight of Defendants Boxer, Erickson, and Ryan as members of the Compliance Committee. Thus, Defendants Boxer, Erickson, and Ryan each face a substantial likelihood of liability arising from their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

197.    American Renal has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for American Renal any part of the damages American Renal suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

198.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

199.    The acts complained of herein constitute violations of fiduciary duties owed by American Renal's officers and directors, and these acts are incapable of ratification.

200.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of American Renal. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of American Renal, there would be no directors' and officers' insurance protection.

Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

201.    If there is no directors' and officers' liability insurance, then the Directors will not cause American Renal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

202.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

205.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

206.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

207.    Under the direction and watch of the Directors, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) The Company's internal control over financial reporting contained material weaknesses, (2) American Renal was not, *inter alia*, preparing its financial statements in accordance with GAAP, as such, the Company would become the subject of heightened regulatory scrutiny and an SEC investigation pertaining to its revenue recognition practices, collections, and matters connected thereto, (3) the Company's financial statements reported in annual and quarterly reports filed with the SEC from 2016 through the date of each respective proxy statement at least were incorrect and unreliable, and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

208.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Boxer, Erickson, and Fish, which allowed the Individual Defendants to continue breaching their fiduciary duties to American Renal. The false and misleading elements

of the 2018 Proxy Statement led to the re-election of Defendants Clark, Hendricks, Jureller, and Kamal, which allowed the Individual Defendants to continue breaching their fiduciary duties to American Renal.

209.   The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

210.   The Proxy Statements also made reference to the Company's Code of Ethics. The Code of Ethics required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, and conduct business in an honest and ethical manner. By issuing false and misleading statements to the investing public, the Individual Defendants violated the Code of Ethics. The Proxy Statements failed to disclose these violations and also failed to disclose that the terms of the Code of Ethics were being violated.

211.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

212.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

213.    Plaintiff, on behalf of American Renal, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of American Renal's business and affairs.

216.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

217.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of American Renal.

218.    In breach of Delaware law and their fiduciary duties owed to American Renal, the Individual Defendants have caused the Company to fail to hold an annual meeting of the stockholders for over 13 months.

219.    In breach of their fiduciary duties owed to American Renal, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) The Company's internal control over financial reporting contained material weaknesses, (2) American Renal was not, *inter alia*, preparing its financial statements in accordance with generally acceptable accounting principles ("GAAP"), as such, the Company became the subject of heightened regulatory scrutiny and an SEC investigation pertaining to its revenue recognition practices, collections, and matters

connected thereto, (3) the Company's financial statements reported in annual and quarterly reports filed with the SEC from 2016 through 2018 at least were incorrect and unreliable, and (4) the Company failed to maintain internal controls.

220. The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

221. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

222. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of American Renal's securities.

223. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly

or recklessly and for the purpose and effect of artificially inflating the price of American Renal's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

224.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, American Renal has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.    Plaintiff on behalf of American Renal has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, American Renal.

229.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses, stock options, or similar compensation from American Renal that was tied to the performance or artificially inflated valuation of American Renal, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

230.    Plaintiff, as a shareholder and a representative of American Renal, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any

performance-based or valuation-based compensation, obtained by the Individual Defendants and due to their wrongful conduct and breach of their fiduciary and contractual duties.

231.    Plaintiff on behalf of American Renal has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

234.    As a result of the failures of internal control and resulting financial misstatements, the Individual Defendants have caused the Company to incur costs associated with the investigation into such misstatements and the restatement of two quarterly reports and one annual report.

235.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused American Renal to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its services.

236.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

237.    Plaintiff on behalf of American Renal has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

63

(a)  Declaring that Plaintiff may maintain this action on behalf of American Renal, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to American Renal;

(c)  Determining and awarding to American Renal the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing American Renal and the Individual Defendants to hold an annual meeting of the stockholders;

(e)  Directing American Renal and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect American Renal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of American Renal to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

       (f)      Awarding American Renal restitution from Individual Defendants, and each of them;

       (g)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (h)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 25, 2019               Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen
609 W. South Orange Ave., Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Luke Johnson, am a plaintiff in the within action.  I have reviewed the allegations made in this  shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of ___7/24/2019___, 2019.

DocuSigned by:

AFA9417379A7497...

Luke Johnson